Charles A. Loreto, J.
On this second trial, the parties stipulated that the court receive as evidence, as if offered de nova, all oral proof and all exhibits offered on the first trial as set forth in the record on appeal. Additional oral proof and exhibits were introduced into evidence. Thereupon, having rested, the plaintiff moved for judgment and the defendant for a dismissal of the complaint. Decision was reserved by the court.
This suit involves the claim of the International Longshoremen’s Association (hereinafter referred to as ILA) to the funds in the treasury of Local 333 in the sum of $177,645.51, which were in the treasury of the Local when it withdrew its affiliation with ILA, the latter claiming a “ reverter ” of the Local’s funds upon its secession from ILA.
The American Federation of Labor (hereinafter referred to as AFL) in September, 1953, expelled ILA from its organization, charging that it had ‘ ‘ permitted gangster, racketeers and thugs to fasten themselves to the body of its organization, infecting it with corruption and destroying its integrity, its effectiveness and its trade-union character ”.
Thereafter and in May, 1954, Local 333, holding a membership referendum on the question of secession from ILA, voted 1,857 for secession and 419 contrary.
On the day that Local 333 voted to secede from ILA, it also voted to affiliate with the United Mine Workers of America (UMW) and thereupon, on May 28, 1954, became Local M-333 of that union. In December, 1954, it withdrew from UMW and in March, 1955, this suit was instituted.
The first trial resulted with opinion in a dismissal of the complaint (19 Mise 2d 612). Upon appeal by the defendant, the Appellate Division, in a penetratingly erudite opinion, directed a reversal of the judgment entered upon the dismissal of the complaint and a new trial (11 A D 2d 15). The purpose for the new trial, as stated by the Appellate Division, was to give ILA the opportunity to attack the AFL finding of corruption for which it expelled ILA.
The Appellate Division, in directing a new trial, stated that the expulsion of ILA by AFL for corruption, under the interlinking constitutions, “ is an event binding on all [the parties], *896 at least, prima facie * * *. The expulsion on the particular finding, however, is binding until upset in a proper forum, either internal or the courts ” (p. 33).
ILA has not upset the finding through any internal means. A retrial having been granted, ILA has sought to do so in the courts. The Appellate Division has delineated what would be required of ILA to accomplish this in the courts. It has held that ILA must show “it [the expulsion for corruption] was void or voidable for fraud, corruption or other condition undermining its vitality. Thus, ILA must establish an infirmity in the finding itself [citations]" ” (p. 33).
To avoid reiteration in this court’s opinion, it adopts and finds the facts recited in the opinion of the Appellate Division beginning on page 19, reading, ‘1 Most of the facts developed at the [first] trial are not in dispute ” and continuing'to page 21, reading, ‘ ‘ Even before the votes were counted, 0 ’Hare withdrew the funds now in dispute and hid them. He told the Local’s membership that this was done to avoid the possibility of Bradley’s seizing the funds on behalf of ILA.”
It is pertinent to note that the evidence relating to ILA expulsion offered by the Local on the first trial was received as proof of the reasons given by AFL for the expulsion and not as proof of the corruption itself. The same evidence was similarly offered on this trial, however, with the additional ruling that when the exhibits spelled out admissions by the parties they would be considered as such and also would be considered as proof of action taken by the parties. Of course, ILA was given the opportunity to attack the AFL finding by proving an infirmity.
Although the burden of proving widespread corruption was on the Local, this burden was prima facie satisfied when it proved the expulsion for that reason and then the burden of going forward shifted to ILA. The query then is, what proof has ILA offered to meet this burden of going forward? The essential additional proof offered by ILA on this trial, intended to overcome the prima facie case of the Local on this point, was the testimony of three of its officials.
ILA raises the point for the first time, on this trial that its expulsion by AFL was accomplished in a manner denying it due process. Its attorneys contend that ILA should have been allowed a confrontation with and the opportunity to cross-examine the witnesses upon whose testimony the State Crime Commission relied and whose report was used by AFL as the reason and basis for its action.
The cases cited by ILA attorneys in their trial memorandum, mentioning “ due process ”, “ fair trial ”, “ right of confronta *897 tian ” in suits involving union expulsion, are inapplicable in the context and under the facts here presented. True the AFL action in expelling ILA was not the result of a formal judicial trial. It was an internal matter. "Whatever procedure used was within the purview of its constitution.
There is no requirement in law that the nature and standard of proof and procedure which prevails in the courts to sustain a decision and judgment should have been used and applied in reaching the determination and action taken by AFL in this case.
This was a disaffiliation proceeding of one national labor organization from another. Something different from the expulsion of a union member from his local union. Here briefly, notice of the charges was adequate, fully understood, opportunity to answer in writing and orally given, advantage, was taken to respond in writing and orally before the executive council of AFL and finally before its union membership at the convention.
The correspondence between the AFL and ILA received in evidence sets forth the charges made, the reason why made, the answer of ILA, the prodding by AFL for action, the request for a hearing, the granting of a hearing and the minutes of AFL convention set forth the ultimate expulsion of ILA.
On February 3, 1953, AFL wrote to ILA:
“ We have followed this investigation (State Crime Commission) with interest and the reported wide-spread alleged crime, dishonesty, racketeering and other highly irregular and objectionable practices in which it is reported that officers of your International and Local Unions have been and are involved. * * *
“We have concluded that these disclosures are of such a serious nature as to call for immediate action by us. We wish to make clear the position of the American Federation of Labor on crime and racketeering within your International and its Local Unions.
“ Tour relationship with the American Federation of Labor demands that the democratic ideals, clean and wholesome free trade unionism must be immediately restored within your organization and all semblance of crime, dishonesty and racketeering be forthwith eliminated.”
AFL requested a report of compliance by April 30, 1953. Under date of May 15, 1953, ILA sent a lengthy answer as its report, which principally justifies its past history, and concludes:
“We need help from you and we welcome it. We are not however, seeking to shirk our responsibility, for we are *898 determined to do our utmost to clean up abuses wherever they exist.
‘ ‘ If any questions remain on which the AFL Executive Council wishes further information or if it believes that any significant factual issues are in dispute, we request the opportunity for a hearing where the position of the ILA can be more fully presented.”
On May 26,1953, AFL replied, acknowledging the ILA answer and report: “ While it [ILA answer] recognizes the existence of the evils which are outlined in our directive, and while it indicates a desire to cooperate to the end of eliminating these evils, the report cannot be accepted as constituting compliance with that directive. The over-all defect which we find in your report is its failure to disclose that the ILA has taken all remedial action necessary to bring about the early actual elimination of these evils so as to permit that organization to serve the legitimate social and economic needs of its members in a manner consistent with the true and wholesome trade union principles established by the American Federation of Labor. It is clear from your report that further steps must be taken forthwith. This fact cannot be emphasized too strongly.” It concludes: “ As before indicated, your report .cannot be accepted as indicating compliance with our directive of February 3, 1953. Your report requests opportunity for hearing in that event and we hereby accede to that request. You may have such representative of your organization as you desire meet with the Executive Council of the American Federation of Labor at its next meeting in Chicago on August 10, 1953. ’ ’
Under date of July 27, 1953, ILA forwarded a supplemental report to AFL and stated that its executive council would appear to meet with the executive council of AFL on August 10, 1953.
That meeting and hearing having been held, then by letter dated the following day, Mr. George Meany, as president of AFL, wrote to ILA, stating that at the annual convention of AFL to be held on September 21, 1953, it would recommend the ILA’s suspension until it has taken action in good faith to comply with its original request.
AFL was shocked by the report of the Crime Commission of corruption in ILA, which was based upon sworn testimony, partly including sworn testimony of officers of ILA. AFL was satisfied to use that report in toto as the charge it made against ILA. ILA did not protest that it could not understand the charge or that it lacked clarity and specificity. AFL demanded that ILA clean house. ILA at first begged for time, then it requested AFL to come in to do that job for it (which AFL properly declined to undertake even if it were within its *899 competence) and when pressed further by AFL, finally ILA reported that it had named a “screening” or “sifting” committee to clean house.
At most this was a temporizing move and totally ineffective since the well-intentioned officers were ‘1 bulldozed ’ ’ into practically giving ILA a whitewash.[1]
Eighty-six members of ILA were named by the Crime Commission, of these Bradley then reported only six of these persons were to be tried, although in this trial he testified that the screening committee was “ designed to straighten matters out” and “To my knowledge, there was never a committee picked to try any official of the ILA.”
On this trial ILA claims that when the officers of both organizations met in Chicago on August 10, 1953, it was virtually denied a hearing-. The three officers who testified on its behalf in effect stated that AFL did not consider at all the charges relating to corruption, that the subject of a dispute concerning a jurisdictional question pertaining to a local painters’ union was brought up at the meeting and that thereupon Mr. George Meany brought the meeting to a close. None of these three witnesses recalled anything else said or discussed at that meeting. This testimony strains the court’s credulity. Surely, the ILA officials went to the meeting to disabuse the AFL officials of their belief of the charges as set forth in the State Crime Commission Report. This could have been accomplished by argument or proof. No evidence was adduced on this trial that any such argument or proof was there advanced by ILA. The cause of good unionism was at stake.[2] That was the sincere belief and strong conviction of AFL. Its righteous wrath was aroused. It would no longer tolerate ILA procrastination and inaction. The minutes of the subsequent AFL convention state that the ILA officials were “ heard ” at their August 10, *900 1953 meeting in Chicago.[3] We must read between the lines as to what took place in Chicago between these warring groups. The court is satisfied that these witnesses called on behalf of ILA did not disclose or, rather, chose not to disclose all that took place at the confrontation. In the face-to-face meeting, one might surmise that the ILA officers had hoped to smoke the peace pipe with the AFL officers and have the latter withdraw their demands. In any event, the court finds that the purpose of the meeting was to afford ILA an additional opportunity to explain its stand with respect to the Crime Commission exposures and that it did not use the meeting for that purpose.
The court concludes that the ILA contention that it was denied a “hearing” by AFL is wholly without merit. This conclusion is fortified by what took place at the convention of AFL held in September, 1953, when the resolution of AFL to sever its connection with ILA was presented to the membership at large. No protest was made to the transaction of that business at that meeting. In fact, ILA officers and members participated, advancing their arguments against a vote for disaffiliation.[4] When put to vote, the membership overwhelmingly voted in favor of the resolution.[5]
*901 On this retrial not a shred of evidence was introduced to show or tending to show fraud, corruption or coercion by AFL in its action and vote expelling ILA. The fact is that AFL was most solicitous in giving ILA every reasonable opportunity to clear its own house and to indicate that it was bona fide doing so. The further fact is that AFL felt extremely bad about the prospect of disaffiliating ILA and proceeded to this end with a heavy heart.* ***[6]
An other point is made by ILA attorneys: that because ILA sought a reargument and clarification before the Appellate Division, which was denied, the validity of ILA expulsion must be determined in the light of the AFL constitution which is now an exhibit in evidence for the first time. The argument is that, inasmuch as the AFL constitution permitted the expulsion of an affiliated international union for any reason whatsoever, or for no reason and without a hearing, the AFL finding of corruption cannot be deemed action taken under the AFL constitution to which ILA had agreed to be bound by virtue of its affiliation with the AFL.
The addition of this document as an exhibit in evidence gives no validity to the argument. It is specious. It chooses to ignore the explicit declaration by the Appellate Division that a fundamental and permeating fiduciary relationship exists between the parties; that something more than mere contractual stipulations are the controlling factors in this case.
The provisions found in the internal constitutions of the several units are not determinative of the issues raised here. For the Appellate Division in this case properly and unequivocally declared what it found to be the result of court decisions and statute that ‘ ‘ the trade union complex is one governed not so much by simple contract law but by principles which determine entrusted funds and fiduciary obligations. * * * the entire union structure in its several layers is viewed as a fiduciary one. (p. 28) * * * A general breach of fiduciary obliga *902 tians, such as widespread corruption or subversion, forfeits the right of the guilty entity to perform its fiduciary role ’ ’ (p. 29).
In its formative and evolutionary years, the concepts or principles enunciated by the courts as the basis for affiliation— such as contract, implied condition, etc.—were probative, provisional concepts satisfactory at the time. Now that labor unionism has developed ■ to its present stage, enveloping the entire country with Nationwide alignments, with local units as a base and interlinking associations on district, State and national levels, independent and interdependent—it has become clearer that the relationship is such that should be spelled out as fiduciary. The rights of the members, who embrace large segments of the public proper, must be considered in their dual status: as members of the union and as members of the public. Their officers on any unit level must be considered as trustees, not only in relation to union funds but also as to true union purposes. Wherever there is a betrayal of their duty in either respect, there occurs a breach of fiduciary duty for which they will be held accountable.
Moreover, the constitution empowers AFL to suspend or expel affiliated unions. Surely, affiliates permeated with corruption violates the declared objectives of AFL set forth in the preamble and article VI of its constitution. And, above all, the general precepts ’ of trade-union morality desired, accepted and enforced when possible by the tremendous numbers of decent and law-abiding union members throughout the labor movement in this country—many or most of whom remain silent for reasons that are generally known—permit and demand that the court invoke and apply equitable principles in a situation of this kind. (See Canfield v. Moreschi, 268 App. Div. 64, 66, 73.)
Mr. George Meany, one of the outstanding leaders and spokesmen for clean trade-unionism, has declared the standard of morality and democracy expected and demanded in trade-unionism by everyone in labor unions, who earnestly wants to promote the cause of true unionism.[7]
*903 Another point must he considered. Although the Appellate Division declared that in most respects for the purposes therein discussed the Local appears as a practical matter autonomous, the nature of the relationship between the Local and ILA was not fully developed at the first trial (p. 31). This court finds that the fund in suit was collected from and solely for the benefit of the Local members. That the only contribution ILA received from the Local was a per capita tax. This court also finds that the Local was a completely autonomous unit. It negotiated and signed its own contracts for wages and other benefits with employers, voted when to go on strike, hired its attorneys and other help, leased offices, purchased bonds, etc. While there were benefits flowing from affiliation with ILA, none of its contacts with ILA infringed on its autonomy, as none of its actions were subject to check or prior approval or subsequent ratification of ILA.
The court concludes that the plaintiff has failed to prove its right to the fund in question and that therefore the complaint should be dismissed on the merits.
Findings of fact and conclusions of law having been waived, this opinion constitutes the decision of the court and judgment may be entered accordingly.

. Quoting Captain Bradley, the minutes of the meeting of Local 333, held on October 7, 1953, report: “Out of the 82 men that were to be screened, they brought back sixteen that were in violation of the laws and regulations of the City of New York, or the union, and out of the sixteen, there were only six of those that could be tried and I, as one of the' members, felt that either the committee was bulldozed or they were too lenient in bringing in all of the members that were to be tried or suspended, and I sent the Committee back, as far as my vote was concerned, to bring in a more concise and a more fair report ”. (Exhibit S-2, SM p. 143.)

. We have an obligation to those who carry out the true principles of the trade union movement, and that obligation is to try to keep this organization abreast of its responsibilities as a great organization of Americans, as an organization that holds an important part in the economic, political and social life of the nation. (See Remarks of AFL President Meany, Report of Proceedings of AFL Convention held in 1953, p. 491.)

. Since we do not regard your supplemental report of July 27, 1953, nor the representations made by you verbally at the hearing on the morning of August 10, 1953, as taking effective action to comply with our request of February 3, 1953 (italics supplied). (See Report of Proceedings of AFL Convention held in 1953, pp. 81-82.)
The officers of the International Longshoremen’s Association also appeared before your Committee, as well as representatives of its several locals on the Atlantic, the Gulf and the West Coast and in the New York area. In addition, individual representatives of the International Longshoremen’s union appeared before and were heard by the Committee. In all of these representations there was no denial of the allegations contained and conditions described in the Executive Council’s Report, but pleas were made for time to correct the evils complained of (italics supplied). (See Report of Proceedings of AFL Convention held in 1953, p. 486.)

. Delegate [President, ILA] Ryan stated: “Now, gentlemen, I know the Executive Council has made this recommendation. I know that the Resolutions Committee has listened to the men who have appeared before it, and I say this, that we have done nothing to disprove the allegations made against us. I mean, the allegations that the Proskauer Committee has not proven yet. We are not proven guilty until we are convicted. I think what we mean is the mismanagement of our organization” (italics supplied). (See Report of Proceedings of AFL Convention held in 1953, p. 489.)

. Following argument on the recommendations contained in the Report of the Executive Council and in its supplementary report, the vote taken on the motion for the revocation of ILA Charter was 79^079 votes in favor of the motion and 736 votes opposed. (See Report of Proceedings of AFL Convention held in 1953, p. 493.) After application stating that “In view of the *901 internal improvements made within the ILA and its Locals, and of onr collective bargaining achievements, we are convinced that ILA is now in compliance with the standards set forth in the February 3, 1953 letter from the AFL to ILA” in 1959, it became an affiliate of AFLIGIO.

. The International Longshoremen’s Association has maintained its affiliation with the American Federation of Labor for sixty years. It is with heavy heart that we have reviewed the developments which made possible the penetration of irresponsible, corrupt and criminal elements into the ranks of this A. F. of L. affiliate. We cannot escape the conclusion that the International Longshoremen’s Association has failed to live up to its trade-union responsibilities and obligations (italics supplied). (See Executive Council’s Report, pp. 53-81, Report of Proceedings of AFL Convention held in 1953, p. 486.)

. The American Federation of Labor must not and will not lend the cloak of trade-unionism to organized lawlessness or to dignify with its affiliation persons and practices alien and inimical to our movevent [sio]. Nor can the Federation tolerate conditions shown to be prevailing in the ILA or to permit their existence to cast doubt and suspicion on our movement as a whole. (See Report of Proceedings of AFL Convention held in 1963, p. 486.)
How gratifying to find these views consonant with the teaching found in the Second Epistle of St. Paul to the Corinthians, eh. 6 :LL16.