Andrew V. Clements,
Ref. Plaintiffs, as officers of the International Association of Machinists, hereinafter referred to as IAM, are seeking a mandatory injunction requiring the defendants, former officers of Local Lodge 2100 of IAM, to turn over to the IAM' certain moneys and other personal property, such as office furniture and files, now in the possession of a custodian appointed by the court.
By order of the international president of IAM, delivered to the officers of Lodge 2100 on January 10, 1961, such officers were suspended for “ dual unionism” and the affairs of the lodge placed in the hands of a designee of the international president. The plaintiffs maintain that under the constitution and by-laws of IAM title to all the property of the lodge remains in the IAM, following such suspension, and that the lodge has continued in existence.
The gist of the defense is that defendants and other members of Lodge 2100 withdrew therefrom and formed Local 333 of United Electrical, Radio & Machine Workers of America, hereinafter referred to as UE: that the defendants occupy the same relative positions as officers of Local 333 as they did as officers of Lodge 2100; that Local 333 of UE is the sole and certified bargaining representative with the employer, the Mica Insulator Division of Minnesota Mining & Manufacturing Company, Schenectady, N. Y.; that plaintiffs have failed to follow the procedures required by the constitution of IAM to divest the defendants of their rights; and that upon general equitable principles the moneys and property should follow the members and be deemed there to vest for the use and benefit of such members.
Both local unions, the IAM and the UE are unincorporated associations. While the action, in form, is between officers of the IAM and the defendants as individuals, in substance the contest is between IAM and UE.
The history of this local union is significant in weighing the contentions of the parties. The group was formerly Local 333 of UE. In June, 1956, the members of such local disaffiliated from UE, disbanded Local 333, and affiliated with IAM as Local Lodge 2100. At that time, or shortly before, the officers of Local 333 withdrew their funds from the bank and held them in a safe-deposit box, removed from UE. However, no claim was made by UE to such funds. The record does not indicate the reasons for leaving UE and joining IAM, but it appears to have been a general movement of locals in District 3 of UE. The transfer was effected by an agreement worked out by representatives of IAM and UE whereby UE locals in District *297 3 could receive IAM charters, be serviced by the same UE personnel, and retain their rights and privileges consistent with the constitution of IAM. While the agreement called for a “vote of affiliation ” by the locals, in this instance no vote of the members of the local was held. Local 2100, successor to Local 333, continued as the bargaining representative with the employer until 1961.
During the latter part of 1960 and particularly in December of that year, members of Lodge 2100, but not the officers, circulated cards upon which the signers indicated their desire to withdraw from Lodge 2100 and obtain a charter from UE. The asserted reason for such move, and the dissatisfaction with IAM, was said to be the failure of IAM representatives to service or take care of the problems of Lodge 2100, particularly the matter of grievances. A hundred or more of such cards were signed which in the opinion of the executive board of the lodge represented a majority of the membership. Two meetings of the executive board of an informal nature were held in December, 1960, at which some members but no officers of the lodge attended, and at the second of which, that of December 28, 1960, a representative of UE attended. At this second meeting it was agreed that a proposal to disaffiliate from TAM and reaffiliate with UE should be formally presented to the executive board and, if approved, recommended to the membership of the lodge. A few days thereafter, and on or about January 3, 1961, officers of the lodge withdrew the funds from the bank and placed them in a safe-deposit box, as they had done in 1956 and also gave written notice to the landlord terminating the lease of the premises used by the lodge.
The UE filed a representation petition with the National Labor Relations Board on January 9, 1961. The formal meeting of the executive board was held on January 10, 1961, at which the proposal to disaffiliate from IAM was approved and action was taken to submit the proposal to the membership of the lodge the following evening, with the recommendation of the board.
Two meetings were required on January 11, 1961, to accommodate the members who worked on different shifts, but the meetings were never held. Just before the opening of the meetings William H. Bradt, Grand Lodge Representative of IAM, delivered to the officers of Lodge 2100 telegrams from the international president of IAM suspending the lodge and all officers, organizers and anyone else elected or selected to represent such lodge. The order of suspension was predicated upon the charge of “ failure of duty and violation of the IAM *298 constitution in that a substantial number of officers and members have engaged in dual unionism ”,
A UE sponsored meeting of the membership was held on January 17, 1961, attended by the National President of UE, at which the recommendation of the executive board of Lodge 2100 to disaffiliate was approved; it was voted to join UE; the action of the officers in safeguarding the funds and property was ratified; a charter from UE using the earlier designation, Local 333, was received; and the officers of Lodge 2100 were continued in their respective offices as officials of Local 333.
Despite the fact that the lodge and its officers were under suspension, an effort was made by IAM to overcome the effects of the action taken on January 17 and prior thereto, by a meeting noticed for February 22,1961. This meeting was called by A. L. Griglio, Grand Lodge representative. The notice expressly excluded the suspended officers and the members who actively and openly defied the lodge by taking part in UE organizational meetings and who signified their intent of not belonging to the IAM. Some 70 or more members attended this meeting, considerably less than the number who attended the January 17 meeting. A new grievance committee was appointed. This appears to be the last evidence of life on the part of Lodge 2100.
With both groups claiming the right of representation, the IAM and the UE agreed upon a date for a representation election, which was held under the supervision of the National Labor ¡Relations Board on April 4,1961. UE having received a majority of the votes cast was certified as the collective bargaining representative on April 11, 1961 and has so continued.
There remains in the factual picture the charges made against the officers of Lodge 2100 by the international president. Letters were mailed to the officers, the day after the delivery of the telegrams effecting the suspension, purportedly specifying the charges, but essentially repeating the “dual unionism” charge. On February 24, 1961 a trial committee was appointed by the general secretary-treasurer of IAM, in accordance with the constitution, and the officers were so notified. It was the recollection of Bradt, the Grand Lodge representative of IAM, that the trial committee met at the Van Curler Hotel in Schenectady, but that the suspended officers did not appear. But international representative Giglio testified that a hearing was never held and that the charges were in abeyance. This was also the testimony of two of the suspended officers, *299 Black and Juliano. It may be concluded that no hearing was held.
Several avenues of approach have been used by the courts in determining property rights where a local union has disaffiliated or seceded from the national or international organization. The traditional or orthodox approach is that of contract law, stemming from the fact that in the early days when labor agreements were matters of first impression, the courts used the fraternal association cases as precedents or guide lines. These cases take the position that members of the local union are jointly and severally bound by the express terms of the constitution and by-laws of the organization, and provisions which vest title to the assets of a local in the international, upon disaffiliation, do not contravene public policy. (Alexion v. Hollingsworth, 289 N. Y. 91; Polin v. Kaplan, 257 N. Y. 277; Overton-Bey v. Jacobs, 25 CCH Labor Cases, par. 68,357, [Supreme Ct., Special Term].)
Plaintiffs place major reliance upon this concept, and upon the IAM constitution, section 5 of article VI of the 1961 constitution and section 4 of article K of the 1958 constitution, which vest in the international president direction and supervision of all local lodges and power to suspend local lodges, officers and business representatives charged with failure of duty or violation of the provisions of the constitution, pending final disposition of the charges. Dual unionism is admittedly a ground for suspension. A suspended local does not disappear legally but continues in some form of existence, it is said. The common term is a “ paper union ”. The IAM, by making periodical reports to the Federal authorities as required by statute, concerning the affairs of Lodge 2100, considers Lodge 2100 extant.
It is clear that a number of members of Lodge 2100, to the knowledge of the officers, were engaged in recruiting lodge members to unite in a disaffiliation movement and rejoin UE. The IAM was justified in suspending the lodge and the officers immediately before the meeting noticed to be held on January 11, 1961, when the executive board intended to recommend disaffiliation. With these findings the simplest approach to the problem would be to apply the contract doctrine and affirm the title to the property in IAM.
But the contract approach or theory does not squarely meet the problem. Mutuality of obligation would require the international officers, in case of suspension, to proceed with the service of a specification of charges and conducting a fair *300 hearing at which the suspended officers could make their defense. Such provisions are contained within the IAM constitution and are required by the Labor Management-Reporting and Disclosure Act of 1959 (see U. S. Code, tit. 29, § 411, subd. [5]). No hearing was ever held. When representatives of IAM and UE agreed to an election under the supervision of the National Labor Relations Board, both consented to the members of the local exercising the democratic right of free choice. It would not be within the spirit of such agreement subsequently to conduct expulsion proceedings against the officers and would obviously be a poor tactic at a time when both internationals were seeking the support of a majority of the members. After the election and when the UE local had been certified as the collective bargaining representative, prosecution of the charges would be an empty gesture. The time for expulsion had passed. What remained of Lodge 2100 was little more than a shadow.
Another approach in affirming retention of title to the assets of a local in the international is the organization theory. It is argued that the international has expanded its assets in organizing and bringing into being the local, that all members of the international have an interest in the solidarity of the organization and its constituent locals, so it is fair to consider that the assets of the locals are to be used for the benefit of all. (Bradley v. O’Hare, 11A D 2d 15, 22.) This reason lacks validity under the facts before us, for IAM received UE Local 333 by agreement of the international officers, not by vote of the membership, and without cost or expense to itself.
At the opposite pole are the trust and autonomy theories. The assets of a local have been considered a trust fund for the benefit of the members, in which the international has no direct right or interest, the local not losing its character as a distinct and separate voluntary association (Huntsmen v. McGovern, 56 O. L. Abs. 170, 91 N. E. 2d 717 [Ohio Common Pleas]), where the court was applying the Labor-Management Relations Act of 1947. The autonomy theory, of which the trust theory appears to be an offspring, has been used where there was not a clear showing that the international and the local accepted the charters of each, but there was a mere affiliation, and permitting the international to claim the assets would have destroyed the rights of some of the members of the local in the pension fund. (Zander v. Laveglia, 26 CCH Labor Cases, par. 86,567 [Supreme Ct.].) The autonomy theory has also been used to protect a local against an international which has been expelled *301 from the American Federation of Labor (Crawford v. Newman, 13 Misc 2d 198, affd. 8 A D 2d 789).
As was in Bradley v. O’Hare (supra) the history of the local and its relationship with the international are important in considering the ownership of assets. Here, under the terms of the agreement between UE and IAM whereby Local 333 was transferred to IAM in 1956, the local took with it all its funds, properties and records; it retained its autonomous rights to elect its officers and stewards and to determine its own affairs as to contract demands and terms, strikes and settlements; the IAM assumed no obligation for existing debts; no charter or membership fee was imposed by IAM; the local could retain its own attorneys for local affairs; it was to be serviced by the same personnel then servicing it in the UE. True, it was understood that the local, about to become a lodge in the IAM would abide by the IAM constitution. But there was no vote of affiliation. This may have been little more than a marriage of convenience, with each party retaining its own. Some credence may be given this assumption from the fact that during the intervening years no effort was made to obtain certification of Lodge 2100 as the collective bargaining representative.
For reasons of common morality local unions have been permitted to retain their assets where the international has been expelled for corruption, as in Bradley v. O’Hare (supra) in which the complaint of the international was dismissed on the merits, for such reason (see 27 Misc 2d 894). Both parties have used Bradley extensively in their briefs as supporting their contentions. This is not surprising as it was, as here, an action for a mandatory injunction, and equitable principles were applied. The use of equitable doctrine to protect the rights of local union members is not a recent innovation of the law (Canfield v. Moreschi, 268 App. Div. 64, 73).
The instant case does not fall within the group of cases dealing with fraud and corruption, as in Bradley, or the group where the local was clearly independent and autonomous, as in Huntsman and Zander. But the well-considered opinion in Bradley (11 A D 2d 15, supra) gives the guide lines for defining the rights here. Considering the peculiar history of this local, as set out above; that the IAM has received the per capita tax or assessment from the members of Lodge 2100; that the moneys are the accumulation of the dues of the members; that the move into the UE was the evident desire of a clear majority of the members, subsequently exercised at a supervised election; it is proper here to apply equitable principles and to say that *302 it is fair and just that the property rights he vested in the new local to be used for the use and benefit of the members in their proper labor activities.
IAM was justified in suspending Lodge 2100 and the officers on January 11, 1961. Under the circumstances here it does not follow that suspension should result in a forfeiture of property. Having lost in a fair contest, IAM should not be permitted to claim part of the subject matter of the controversy. Lodge 2100 may continue to exist, for technical reasons, in the eyes of IAM, but it has ceased to function by reason of abandonment by its former members and for all practical purposes has been superseded by Local 333. The time has come here for tranquillity, terminating the dispute, and permitting Local 333 to function in an orderly manner.
On March 21, 1963 Mr. Justice Felix J. Aulisi signed the following order: ‘1 Hereby ordered that the findings of fact and conclusions of law of the Referee, Andrew V. Clements, rendered on the 1st day of November, 1962, be and hereby are confirmed in all respects.”